Per Curiam :
Plaintiff, a government employee, claims entitlement to wages for supervisory work he says he performed. On the basis of the trial commissioner’s findings, which we adopt, it is clear that plaintiff has failed to prove that he performed supervisory duties entitling him to any higher grade or pay than he received. Therefore, he cannot recover and his petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Bichard Arens and the briefs of the parties, without argument of counsel, makes findings of fact as follows:
1. (a) Plaintiff was employed in 1958 at the Federal Aviation Agency, Eastern Begion Headquarters, Jamaica, New York (hereinafter called the Agency), as a Bindery Worker, Grade WB-8, which is a Wage Board position. In 1961, he was promoted to Grade WB-9. He retired in 1965.
*866 (b) He contends that his duties and functions were substantially supervisory in nature and that he was entitled to, but was not paid, supervisor’s wages.[1]
(c) This court, in considering plaintiff’s motion and defendant’s cross-motion for summary judgment, denied both motions without prejudice and ordered the case returned to the trial commissioner “for determination of the extent of the supervisory duties and functions performed by plaintiff in his original position.”
(d) Pursuant to the above order of the court, two pretrial conferences were conducted in which a number of exhibits were admitted into evidence, and two trial sessions were held in which witnesses for both parties testified.
2. (a) At all pertinent times the Printing and Publication Section of the Publishing and Graphics Branch of the Administrative Services Division of the Federal Aviation Agency, Eastern Eegion Headquarters, had two units: the printing plant unit and the publications and distribution unit. Both units were under the overall supervision of the chief of the Section, but each unit was under the immediate supervision of a lead foreman whose duties included assigning job priorities and filling out a form consisting of the operator’s instructions. The printing plant had two sub-units: the printing sub-unit and the bindery sub-unit, each of which was under the immediate supervision of a “snapper,” i.e., “the man that actually sees that each man is performing his job according to standards and policies.” These standards and policies were determined in the first instance by the Congressional Joint Committee on Printing and were, thereafter, implemented by the Agency regulations and shop instructions.
(b) Plaintiff was the “snapper” of the bindery sub-unit in which he and one other bindery worker, of lower grade (WB-7), were regularly employed, but in which extra help *867 from the printing sub-unit would occasionally be employed when necessitated by the workloads. The extra help would average 4 to 6 hours a week. Plaintiff (1) operated the various machines used in binding, (2) assigned the work to and supervised the other regularly employed bindery worker and the extra help and (3) maintained and made minor repairs on the bindery equipment. Most of the machines used in binding (collators, staplers, hole punchers, cutters, and folders) required the full attention of the operator.
(c) As appears in the chronology hereinafter set forth, there is conflict between the parties as to the percentage of plaintiff’s time which was spent in supervision of the other regularly employed bindery worker and the extra help. Some of the conflict derives from differing concepts of the meaning of the word “supervision.” It is found that while the other regularly employed bindery worker and the extra help were at all times subject to plaintiff’s supervision, plaintiff spent about 10 percent of his time in actually assigning work to them and checking, instructing, and correcting them; and that the remaining 90 percent of plaintiff’s time was spent in the operation of bindery equipment, with the exception of an occasional short expenditure of his time in maintaining or making minor repairs to the equipment.
3. (a) On April 6, 1961, the Agency issued a position description for plaintiff’s position, in which it was noted that under the general supervision of the plant foreman, plaintiff served as chief of the bindery sub-unit and, as such, supervised the operation of all bindery equipment; that he established preventative maintenance schedules and the arrangement of work to insure timely completion; that he supervised one bindery operator and operated certain machines; that the shop foreman assigned job priorities and insured that overall completion of targets was accomplished ; that plantiff served as chief of the bindery sub-unit and planned all bindery work in the shop, taking into consideration completion schedules, copy and page requirements, and determined the equipment to be used for each process; and performed preventative maintenance and made minor repairs on the machinery in the sub-unit. Plaintiff was classed as a nonsupervisory bindery worker.
*868 (b) On April 16, 1961, plaintiff was promoted to Grade WB-9 (nonsupervisory) with an hourly rate of pay of $3.08.
4. (a) On July 20, 1962, the chief of the Administrative Services Branch of the Agency sent a memorandum to the chief of the Personnel and Training Division of the Agency, in which it was stated that plaintiff had requested that his position description be reviewed; and that in view of the fact that plaintiff’s position description included supervisory responsibilities, plaintiff felt that instead of being classified as a W-9 (nonsupervisory), he should be classified under the supervisory work schedule.
(b) On September 7, 1962, a classification specialist for the Agency performed a desk audit of plaintiff’s position. The classification specialist conferred for approximately 2 hours in the bindery sub-unit with plaintiff who explained his duties and demonstrated the equipment on which he worked. At that time, plaintiff stated that he supervised one employee; that this took 10 percent of plaintiff’s time and that he spent the remaining 90 percent of his time in the operation of bindery equipment. Plaintiff further stated that during periods of heavy workloads extra help would be furnished to him. The classification specialist also conferred with two of plaintiff’s superiors and obtained information from the printing industry regarding pay scales for similar binding work and duties.
(c) Thereafter, the classification specialist prepared a draft of another position description for plaintiff’s position, which contained substantially the same material as the April 6, 1961, position description (finding 3. (a)), but stated that plaintiff served as bindery sub-unit supervisor[2] and, in that capacity, supervised one subordinate for 10 percent of the time, and performed the same work as his subordinate for 90 percent of the time in the operation of certain, equipment. The reference in the April 6, 1961, position description to *869 plaintiff’s supervision of the operation of all bindery equipment was omitted. The draft continued the classification of plaintiff as a WB-A402-09 (nonsupervisory) bindery worker.
(d) In the period of time which intervened between the two above-mentioned position descriptions, there had been no substantial change in the type of duties which plaintiff was performing.
(e) On September 14, 1962, plaintiff sent a memorandum to the classification specialist stating that he disagreed with the draft of the position description which had just been prepared. Plaintiff stated that instead of supervising the other bindery worker for 10 percent of the time, he (plaintiff) supervised him “100% of the time he is under my supervision.”
(f) On September 20, 1967, the Classification Branch of the Agency advised the Administrative Services Branch that plaintiff disagreed with the percentage of time shown on the draft of the position description and resubmitted the draft to the Administrative Services Branch for review and to ascertain that the information in the draft was correct.
(g) On October 4,1962, the Acting Chief of the Administrative Services Division (Branch) responded as follows:
The attached position description has been carefully reviewed and is deemed to be accurate and correct.
We have attempted to resolve by discussion with the employee any disagreement arising with respect to the facts. It is the opinion of every supervisor concerned that the apportionment of ten percent supervisory time is indeed accurate and all that should be necessary for the type of operation that exists. The employee feels that his supervisory time should be thirty percent. However, in the course of conversation he voluntarilly [sic] offered to make a deal to reduce this to fifteen percent. He was informed that our purpose was not to make deals but to make accurate job sheets. He was further informed that it is our belief that his pay is predicated on the type of machinery used and the complexity of the job and that the supervision had little effect upon the determination of grade.
I doubt if this matter is resolved in the sense that the employee agrees with his supervisors. His principle [sic] contention appears to be that as a supervisor he should be paid more. It was explained to him that as a W-9 he *870 is getting paid more than the subordinate who is a W-7 and that this would appear to be an adequate recognition of his status.
Mr. Mitchnik refuses to sign the OF-8 in item 12 and has stated that his attorney has advised him not to. For your further information, this memorandum was reviewed by Mr. Mitchnik who does not concurr [sic] with the statements therein. He now states that he supervises one hundred percent of the time and that his conversation above wherein he indicated thirty percent of the time, he was speaking about a differential in pay as opposed to time spent in supervision. However, the original statement was made with Mr. Cahill as a witness.
5. (a) On October 9, 1962, plaintiff’s counsel wrote to the Eastern Region Board of Grievance Appeals of the Agency, requesting a hearing to determine whether plaintiff’s classification under the nonsupervisory work schedule was proper, and stating that it was plaintiff’s contention that he should be placed under the supervisory schedule at $4.13 per hour instead of under the nonsupervisory wage scale at $3.08 per hour.
(b) On October 16, 1962, the chief of the Personnel and Training Division of the Agency replied to plaintiff’s counsel, in part, as follows:
Position classification determinations are specifically excluded from consideration under the Agency’s grievance procedure. This exclusion, as a matter of policy, is set forth in FA A Handbook OA P-3770.2 and was originally included in Agency Practice 3-771. We believe a copy of the latter policy statement is in your possession.
The letter further stated that plaintiff’s position was then under review by the Classification Branch of the Personnel and Training Division, that if plaintiff was not satisfied with the Agency decision, he could appeal to the Civil Service Commission, and that the classification appeal to the Commission of an employee in a Wage Board position is limited specifically to a determination as to whether the employee’s duties are properly subject to prevailing rates of pay or to the Classification Act of 1949.
(c) On November 28, 1962, the Classification Branch notified the Administrative Services Division that a review *871 oí plaintiff’s position description resulted in a determination that the position was properly classified as Bindery Worker, WB-4402-09, and that plaintiff should be notified to that effect and informed of his appeal rights.
(d) On December 10, 1962, plaintiff’s counsel notified the Agency that plaintiff desired to appeal the foregoing decision of November 28,1962, to Headquarters, Washington, D.C.
(e) On December 14,1962, the Agency replied by requesting certain information relating to plaintiff’s contentions.
(f) On December 21, 1962, plaintiff returned to the Agency the position description which he signed under protest. In an accompanying letter, plaintiff challenged the statement in the position description which reflected supervision for only 10 percent of the time. He agreed that the assigned title of Bindery Worker, WB-9, was accurate, but contended that he should be placed under the supervisory schedule at $4.18 per hour. Plaintiff requested a hearing.
8. (a) On January 15,1963, representatives of the Agency met with plaintiff and his counsel at the Agency office at which time the representatives of the Agency explained classification standards and methods, and the basis for the determination that plaintiff’s work failed to conform to the criteria established for a supervisory position; but plaintiff’s counsel stated that he intended to file a dual appeal on the theories (1) that plaintiff should have been paid on the supervisory schedule, based on his position description prior to July 1962, and (2) that plaintiff should be paid currently on a supervisory schedule since the then current position description inadequately set forth plaintiff’s supervisory responsibilities.
(b) On January 16, 1963, plaintiff requested a classification appeal to the Federal Aviation Agency in Washington, D.C.
(c) On February 8, 1963, the Agency forwarded to the Federal Aviation Agency in Washington, D.C., plaintiff’s file, his appeal, and the Agency decision and explanation.
(d) On February 26,1963, the chief of the Compensation Branch, Washington, D.C., requested that in view of the dispute between the Agency and plaintiff regarding the ex *872 tent of supervision, certain questions should be answered by plaintiff pertaining to his work and responsibilities, and that the supervisor should review plaintiff’s answers and concur.
(e) On February 28,1963, the administrative chief of the Agency advised the chief of the Compensation Branch, Washington, D.C., that there was little chance that the parties would agree as to plaintiff’s supervisory duties, and that the Agency should not adopt the position that an employee’s concurrence is necessary to a position description. The chief of the Compensation Branch, Washington, D.C., insisted that the parties attempt to reconcile their differences, but wrote that if they could not do so, the decision should be made by a Mr. Bakke (unidentified).
(f) On March 1, 1963, the chief of the Classification Branch of the Agency explained to plaintiff that the Wage Board standards prevented paying him a supervisory rate. Plaintiff refused to signify agreement with the contents of his position description (finding 4. (c)), and stated that he would not be satisfied unless he had his former position description (finding 3. (a)), which he claimed portrayed his supervisory responsibilities more adequately.
(g) On March 14, 1963, plaintiff’s counsel sent a letter to the Agency in reply to a series of questions which had been put to plaintiff respecting his duties.
(h) On April 11, 1963, the chief of the Administrative Services Division of the Agency sent a memorandum to the chief of the Personnel and Training Division of the agency, in response to the reply of March 14,1963, by plaintiff’s counsel. The memorandum restated that plaintiff exercised supervision approximately 10 percent of the time, and that he was a “working” supervisor and that he did not exercise certain management responsibilities.
(i) On May 15,1963, plaintiff’s counsel sent a letter to the Agency in which it was contended that plaintiff exercised supervision in excess of 50 percent of the time. The letter further stated that a hearing would not accomplish anything at that time.
(j) On June 11,1963, the Agency wrote plaintiff’s counsel that plaintiff’s file would be resubmitted to the Personnel Programs Division for review as a classification appeal.
*873 (k) On June 24, 1963, the Federal Aviation Agency, Washington, D.C., determined that on the basis of a comparison of plaintiff’s position with all pertinent Wage Board evaluation standards published by the Department of the Army and prescribed for use within the Federal Aviation Agency,[3] plaintiff was correctly allocated a Bindery Worker, WB-4402-09. It was further determined that:
*****
The supervisory responsibilities described in the position description equate to those set forth in the Department of Army evaluation standards for journey man bindery work. These responsibilities consist of giving instruction to lower graded binders on set-up and machine operation on non-standard project and supervising lower graded binders as required. The presence or absence of this element has no bearing on the point rating for responsibility. In the subject position, these responsibilities are present. The time devoted to these responsibilities and the number of persons directly and continuously supervised are not sufficient to meet criteria for allocation by the supervisory standards.
tft * * * *
(l) On July 31, 1963, the Agency notified plaintiff’s counsel that the Agency decision had been affirmed and that the Civil Service Commission would not accept an appeal to determine the grade of a Wage Board position.
7. In November 1965, plaintiff retired on the advice of his doctor. At the trial, plaintiff contended that his retirement was also caused by “harassments” by his superiors, but the evidence does not substantiate this contention.
8. Civilian Personnel Begulations P42, entitled “Supplementary Job Evaluation Standards for Wage Board Jobs,” issued by the Department of the Army, December 1960, and pertinent to this case:
_ (a) provide that in order to be evaluated as a supervisor and paid on supervisory rate schedules, a job must require the supervision of people, and supervisory responsibility must match substantially the descriptions for supervisory situations, general foreman, foreman, *874 lead foreman, and assistant, provided in regulations; further provide that while supervision of people is requisite, the number of persons supervised is not to be used as a determinant of coverage.or exclusion; and that it is the character of the supervision as described in the supervisory situations and not the number of employees supervised which is to be used as the criterion;
(b) set forth three elements which characterize supervisory jobs, as follows :
(1) Base Level of Work Directed, which measures the relative complexity of the work done by the nonsupervisory subordinates,
(2) Supervisory Responsibilities, which measure the type and degree of authority and responsibility which exist for control over the work supervised, and
(3) Volume of Operations, which measures the amount of work performed in the organizational segment of the working group supervised;
(c) establish criteria for evaluation of each of the three elements above-mentioned; and
(d) provide a table to convert the total credits for the three elements to a supervisory grade.
9. (a) At the trial, the chief of the Glassification Branch of the Agency and the classification specialist of the Agency, who prepared the 1962 description of plaintiff’s position, testified in the aggregate that the intermittent supervisory duties and responsibilities which plaintiff had did not qualify him under the above-quoted regulations for classification in a supervisory position; that even if plaintiff had spent 100 percent of his time supervising the other bindery worker, his position classification would still be nonsupervisory because the employment situation in which plaintiff was engaged did not constitute a supervisory situation within the regulations; and that supervision of machines is not embraced within the word “supervision” as used in the regulations.
(b) The foregoing testimony was not rebutted.
CONCLUSION OF LAW
On the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover. Therefore, his petition is dismissed.

 Plaintiff relies on certain provisions of the Classification Act of 1949, as amended, and cites 5 U.S.C. §§ 1071-1112 (1964 ed.) ; 63 Stat. 954, et seq. Section 1071 reads in part:
§ 1071. Congressional declaration of policy.
It is the purpose of this chapter to provide a plan for classification of positions and for rates of basic compensation whereby—
(1) in determining the rate of basic compensation which an officer or employee shall receive, (A) the principle of equal pay for substantially equal work shall be followed * * *.

 At tie trial, the classification specialist who prepared the 1962 description of plaintiff's position, testified that the term “sub-unit supervisor” was an organizational title which had been applied to plaintiff by his immediate supervisor and was not a designation made by a position classification specialist. The chief of the Classification Branch of the Agency testified that the title was used for administration convenience and was not the official title of plaintiff’s position, nor did it carry any connotation of increased functions or compensation.

 These standards reflected a technique of classifying and evaluating positions on a point rating factor system, whereby a printed description of a position was compared to a standard and the several aspectB of the position given prescribed weight (see finding 8).